# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ANTHONY MARTINEZ,
    *Plaintiff,*

    v.                                      No. 3:20-cv-00231 (JAM)

PAYNE *et al.*,
    *Defendants.*

## INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Plaintiff Anthony Martinez is a sentenced prisoner in the custody of the Connecticut Department of Correction ("DOC"). He filed this lawsuit *pro se* and *in forma pauperis* against numerous DOC officials, principally challenging his designation as a Security Risk Group ("SRG") member and placement in restrictive housing. I will allow Martinez's procedural due process claim to proceed against defendants Russell, Payne, and King, his deliberate indifference claim to proceed against Russell, and his injunctive relief claim to proceed against defendants Aldi, Santiago, and Erfe, but I will dismiss his remaining claims.

### BACKGROUND

Martinez names seven defendants in his complaint: Correction Officer Payne; Lieutenant J. Russell; Director of Security Antonio Santiago; Hearing Officer King; District Administrator Scott Erfe; Warden Mulligan; and SRG Coordinator John Aldi. Doc. #1 at 1-4. The following facts as alleged in the complaint are accepted as true only for purposes of this ruling.

At all times relevant to the incident underlying this action, Martinez was a pretrial detainee. *Id.* at 16 (¶ 81). On November 29, 2018, Martinez was transferred to New Haven Correctional Center ("New Haven") and housed in general population. *Id.* at 6 (¶ 2).

On December 12, 2018, Martinez was instructed to pack his property and report to admitting and processing ("A&P"). *Ibid.* (¶ 3). While walking to A&P, Officer Payne stopped Martinez in the hall and led him to a secluded room where Officer King and Lieutenant Doe were waiting. *Ibid.* (¶¶ 4-5). They gave Martinez a folder containing printouts of his Facebook status, and Officer Payne told him that he was going to restrictive housing unit ("RHU") for SRG designation. *Ibid.* (¶¶ 6-7). Martinez denied being a gang member and stated that he had completed the SRG program in 2017; he had been designated an SRG member in December 2016 and successfully completed the program in September 2017. *Ibid.* (¶¶ 8-9).

Officer Payne asked Martinez why he "talk[s] like a Blood" on Facebook if he was not a gang member. *Ibid.* (¶ 10). Martinez said the statements were song lyrics and interview quotes from his favorite rap artist, and that repeating the statements did not make him a member of the Bloods. *Ibid.* (¶ 11). Officer Payne replied that "[i]t doesn't matter" and they were going to find Martinez guilty and send him to RHU "regardless." *Id.* at 7 (¶ 14). Officer Payne similarly disregarded Martinez's claim that he could not be punished because the evidence did not show that he had violated any DOC directives. *Ibid.* (¶¶ 15-16).

Officer Payne asked Martinez to sign a document acknowledging that he had been shown the evidence against him. *Ibid.* (¶¶ 16-17, 19). When Martinez refused to sign, Officer King said Martinez would receive a disciplinary charge for disobeying a direct order and would be sent to the maximally restrictive Phase 1 instead of Phase 2 of the SRG program. *Id.* at 7-8 (¶¶ 18, 20-21). Martinez signed the document and was transferred to RHU without a disciplinary charge, but also without a hearing or an opportunity to contest the designation. *Id.* at 8 (¶ 22).

While being admitted to RHU, Martinez experienced a panic attack from his post-traumatic stress disorder caused by his 2016 SRG designation and confinement in isolation at

Manson Youth Institution ("MYI"). *Id.* at 8-9 (¶ 24). When they saw Martinez shaking and hyperventilating, Lieutenant Russell and Office Payne opened the cell door, spoke with Martinez, and calmed him down. *Id.* at 9 (¶¶ 25-26). After Martinez explained his past experiences at MYI, Lieutenant Russell said he would move Martinez from a single cell to a cell with a Blood member. *Ibid.* (¶¶ 27-28). Martinez asked to be placed in protective custody. *Ibid.* (¶ 29). Lieutenant Russell said he could not place Martinez in protective custody without a valid reason and left the cell before Martinez could offer one. *Ibid.* (¶ 30).

Martinez was moved to a cell with an SRG Blood member. *Ibid.* (¶ 31). The inmate began threatening to assault or kill Martinez if he did not move to protective custody because Martinez was not a Blood member. *Ibid.* (¶ 32). Martinez reported the threats to Lieutenant Russell and again requested placement in protective custody. *Ibid.* (¶ 33). Lieutenant Russell did not believe Martinez and denied the placement. *Ibid.* (¶ 34).

On December 14, 2018, Martinez experienced another panic attack from all the threats he was receiving. *Id.* at 10 (¶ 35). He was brought to the medical unit, given Benadryl, and returned to his cell. *Ibid.* (¶¶ 36-37).

On December 21, 2018, Martinez was transferred to the "Phase 2 ticket group" at Walker Correctional Institution ("Walker"). *Ibid.* (¶ 38). In the SRG Phase 2 ticket group, inmates are confined in their cells for 23 hours per day during the week and 24 hours per day on the weekend while inmates in general population are allowed out of their cells for 2 to 3 hours each day. *Id.* at 10-11 (¶ 44). During the one-hour recreation period, SRG inmates are forced to go outside even in inclement weather or remain in their cells while general population inmates have indoor recreation with the option to use the gym at least once per week and to go outside if weather permits. *Id.* at 11 (¶ 45). SRG inmates are allowed three phone calls per week while general

population inmates are allowed six phone calls per week. *Ibid.* (¶ 46). SRG inmates are allowed

three showers per week while general population inmates can shower daily. *Ibid.* (¶ 47). SRG

inmates are restricted to one visit per week from immediate family while general population

inmates are permitted multiple visits by anyone approved to visit them. *Ibid.* (¶ 48).

Unlike general population inmates, SRG inmates are denied congregate programs and

meals, access to a prison law library, and religious services in the chapel. *Ibid.* (¶ 49). Also

unlike general population inmates, SRG inmates are denied the ability to earn Risk Reduction

Earned Credit ("RREC") and cannot purchase a television, hot pot, or CD player adapter. *Id.* at

11-12 (¶¶ 49-50). SRG inmates can spend only $35.00 per week at the commissary while general

population inmates can spend $75.00 per week. *Id.* at 12 (¶ 51). SRG mail experiences delays

because it is under constant review. *Ibid.* (¶ 52).

While Martinez was confined at Walker, gang members threatened to assault and kill him

because he was not a Blood. *Ibid.* (¶ 54). On May 23, 2019, he learned of the SRG designation

appeal process from another inmate and filed a classification appeal. *Id.* at 13 (¶¶ 60-61).

On June 5, 2019, Martinez was transferred to Corrigan Correctional Institution

("Corrigan") to begin Phase 3 of the SRG program. *Ibid.* (¶ 62). On June 6, 2019, he was

assaulted by three Blood members at recreation. *Ibid.* (¶ 63). One of the inmates who assaulted

Martinez was a Blood member who had threatened to assault and kill him at New Haven. *Ibid.*

(¶ 64). After the assault, Martinez received medical treatment for lacerations on his face and

neck, lumps on his head, and bruises on his body. *Ibid.* (¶¶ 65-66).

Martinez was sent to RHU and received a ticket and disciplinary sanctions because of the

incident. *Ibid.* (¶ 67). On June 13, 2019, Martinez was released from RHU and assigned to B-unit

where he was threatened with assault or death if he did not go into protective custody or pay a

"ransom" to be permitted to remain in the unit. *Ibid.* (¶¶ 68-69). Martinez pays $5.00 per week from his commissary purchases as ransom. *Id.* at 14 (¶ 71).

On June 25, 2019, Administrator Erfe denied Martinez's classification appeal because it was not timely filed. *Ibid.* (¶¶ 72-73). On July 24, 2019, Martinez filed a level 2 appeal stating that regardless of his appeal's timeliness, it was unlawful to house him with sentenced inmates in the punitive SRG program. *Ibid.* (¶ 74). On July 29, 2019, the level 2 appeal was denied because a "District Administrator decision is not subject to further review." *Ibid.* (¶¶ 75-76). On August 1, 2019, Martinez filed a level 3 appeal arguing that the time limit to file a classification appeal does not run until the problem is discovered, and he did not discover that his placement in the SRG program was unlawful until the day he filed his initial appeal. *Id.* at 14-15 (¶ 77). On August 20, 2019, he received the level 3 appeal form back with no response. *Id.* at 15 (¶ 78).

Martinez still has not been issued a "ticket" or afforded a hearing. *Id.* at 10 (¶ 39). Because this is the second time Martinez has been designated an SRG member, he must spend two years in the program until December 2020. *Id.* at 12 (¶ 56).

Martinez asserts several claims for violation of his rights under the First and Fourteenth Amendments: (1) Russell, Payne, and King designated him an SRG member in retaliation for his Facebook posts; (2) Russell, Payne, and King sent him to RHU as an SRG member without a classification hearing; (3) Russell and Mulligan were deliberately indifferent to his inhumane and punitive conditions of confinement; (4) Erfe rejected his classification appeal and thereby failed to rectify the retaliation and conditions of confinement; and (5) Santiago and Aldi orchestrated the actions of Russell, Payne, King, and Erfe. *Id.* at 17-21. Martinez is suing the defendants in their individual and official capacities, and seeks damages and costs, declaratory relief, and an injunction removing him from segregation as an SRG member. *Id.* at 22.

**DISCUSSION**

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint

against a governmental entity or governmental actors and "identify cognizable claims or dismiss

the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or

fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a

defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations

of the complaint must be read liberally to raise the strongest arguments that they suggest. *See

Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading

standard for courts to evaluate the adequacy of allegations in federal court complaints. A

complaint must allege enough facts—as distinct from legal conclusions—that give rise to

plausible grounds for relief. *See, e.g*., *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp.

v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro

se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet

the basic plausibility standard. *See*, *e.g*., *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d

Cir. 2015).

### *Retaliation*

"Prison officials may not retaliate against inmates for exercising their constitutional

rights." *Riddick v. Arnone*, 2012 WL 2716355, at *6 (D. Conn. 2012). In order to establish a First

Amendment retaliation claim, an inmate must show that: (1) he engaged in protected conduct;

(2) an official took adverse action against him; and (3) there was a causal connection between the

protected conduct and the adverse action. *See Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019).

6

An adverse action is conduct of sufficient magnitude that it would deter a similarly situated person of ordinary firmness from exercising his right to speech. *Ibid.*

An allegation that prison officials relied on social media posts for making a determination of a detainee's gang membership "is not enough to satisfy the third element, a causal connection between the adverse action and the protected speech," as is required to state a valid First Amendment retaliation claim. *Caves v. Payne*, 2020 WL 1676916, at *4 (D. Conn. 2020); *see also Wilson v. Santiago*, 2020 WL 1989135, at *2 (D. Conn. 2020). That is because "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019) (same).

Martinez alleges that defendants Russell, Payne, and King confronted him with his social media posts and that Payne asked him why he spoke like a Blood on Facebook if he was not a gang member. When Martinez tried to explain that they were mere song lyrics and interview quotes from his favorite rapper, Payne responded that he would be sent to RHU regardless. Martinez was subsequently admitted to RHU.

Martinez's allegations show the defendants used his social media posts as evidence of his gang affiliation. In the absence of an allegation that they sought to punish or retaliate against Martinez simply for engaging in First Amendment-protected expression (or for the content of that expression apart from what it suggested about Martinez's gang affiliation), the complaint does not plausibly allege a First Amendment retaliation claim. *See Caves*, 2020 WL 1676916, at *4 (rejecting First Amendment retaliation claim because "[t]he defendants' use of social media posts and Caves' own statements therein, is no different than if Caves announced upon his arrival

at the facility that he was a gang member and the defendants used those statements to designate him to the SRG unit"). Accordingly, I will dismiss Martinez's First Amendment claim.

### *Procedural due process*

In order to establish a claim of a violation of procedural due process, an inmate must show that: (1) he has been deprived of a liberty or property interest; and (2) the procedures followed by the State were constitutionally deficient. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*). Liberty restrictions on a pretrial detainee may not amount to punishment of the detainee, and a pretrial detainee who is placed in segregation for administrative reasons is entitled to "some notice of the charges against him and an opportunity to present his views." *Benjamin v. Fraser*, 264 F.3d 175, 188, 190 (2d Cir. 2001) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979), and *Hewitt v. Helms*, 459 U.S. 460 (1983)).

Martinez alleges that defendant Payne diverted him from reporting to A&P and led him to a secluded room where defendants Russell and King were waiting. There, the three defendants sprung Martinez's social media posts on him, and Payne accused him of being a gang member. When Martinez offered an innocent explanation, Payne responded that he would be sent to RHU regardless. Then, when Martinez refused to sign a document stating that he had been presented with the evidence against him, King threatened him with discipline and confinement in a more restrictive phase of the SRG program. Martinez was subsequently admitted to RHU.

Although Martinez's allegations suggest this encounter was in fact his SRG hearing, they also plausibly show that it was procedurally deficient in that he was denied notice of the charges against him and a meaningful opportunity to be heard. Accordingly, I will allow Martinez's procedural due process claim to proceed against Russell, Payne, and King.

*Substantive due process*

In order to establish a claim of a violation of substantive due process regarding conditions of confinement, a pretrial detainee must show either that officials were deliberately indifferent to inhumane conditions or that the conditions are punitive. *See Darnell v. Pineiro*, 849 F.3d 17, 34 n.12 (2d. Cir. 2017). To establish a claim of deliberate indifference to conditions of confinement, a pretrial detainee must show that: (1) a condition posed "an unreasonable risk of serious damage to his health"; and (2) the official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed" such a risk. *Id.* at 30, 35 (cleaned up). To establish a claim that conditions are punitive, a pretrial detainee must show that a condition was "imposed for the purpose of punishment," either directly with proof of such intent or indirectly by showing that the condition is not reasonably related to a legitimate governmental purpose, such as institutional security. *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017) (cleaned up).

Martinez alleges that after his assignment to RHU in New Haven, defendant Russell placed him in a cell with a Blood member even though Martinez denied being a Blood. Then, Russell denied Martinez's request to be placed in protective custody after the member threatened Martinez's life. The constant threats caused Martinez to suffer a panic attack for which he required medical care. After Martinez was transferred to Walker in December 2018 to begin Phase 2 of the SRG program, he was confined to his cell for 23 to 24 hours per day; had restrictions on visits, phone calls, commissary purchases, and showers; was denied congregate programs and meals, law library access, and religious services in the chapel; experienced mail delays; could not earn RREC; and received threats from Bloods. After he was transferred to

9

Corrigan in May 2019 to begin Phase 3 of the SRG program, he filed a classification appeal.

Martinez was subsequently assaulted by three Blood members, including a member who

threatened him at New Haven, and was forced to pay a ransom to prevent future assaults. In June

2019, defendant Erfe denied his classification appeal as untimely.

      "It is well settled that, in order to establish a defendant's individual liability in a suit

brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in

the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir.

2013). An official's personal involvement in a constitutional violation can be shown by his direct

participation in the violation or by his supervisory capacity over those directly participating. *See*

*Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020). An official is liable for supervising

constitutional violations if he: (1) directly participated in the violation; (2) failed to remedy the

violation after being informed of it through a report or appeal; (3) created or permitted to

continue a policy or custom under which the violation occurred; (4) was grossly negligent in

supervising a subordinate who committed the violation; or (5) failed to act on information

indicating that a violation was occurring. *See Lombardo v. Graham*, 2020 WL 1909581, at *2

(2d Cir. 2020) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Simply alleging

that an official held a high position of authority is not enough for that official to be liable on a

theory of supervisory liability. *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016).

      Although Martinez alleges that he was subjected to numerous deprivations and even an

assault while in the SRG program at Walker and Corrigan, the sparse allegations of the

complaint do not plausibly state that any of the named defendants were personally involved with

or had knowledge of the imposition of any of these conditions. The closest it comes to doing so

is the allegation that he filed a classification appeal with Erfe, but he does not state the grounds

on which he based his appeal, so it is unclear what facts he apprised Erfe of. *See also McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) ("[I]t is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of.").

Nevertheless, Martinez has stated a deliberate indifference claim against Russell for refusing to place him in protective custody, or at least transfer him to a different cell or unit, after he alerted Russell of his cellmate's death threats. Martinez alleges that all the threats he received caused him to suffer a panic attack for which he required treatment, and Russell was previously made aware that he was prone to such attacks because of his time spent in isolation as a youth. *See Darnell*, 849 F.3d at 30 (noting an objective deprivation that can violate the due process clause "includes the risk of serious damage to physical and mental soundness") (internal quotations and citation omitted); *see also Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (noting that prisoner barred by 42 U.S.C. § 1997e(e) from recovery for mental and emotional injury but that the statute "does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief"). Accordingly, I will allow Martinez's deliberate indifference claim to proceed against Russell, but I will dismiss any substantive due process claim as to any other defendants.

### *Injunctive relief*

Because defendants Russell, Payne, and King work at New Haven, Doc. #1 at 2-3, and because Martinez is currently confined at Corrigan, *id.* at 23, I will allow the claims against them to proceed only in their individual capacities for money damages. *See Washington v. McKoy*, 2020 WL 3042122, at *1 (2d Cir. 2020) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.") (quoting *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)).

On the other hand, an inmate may sue a state official in his official capacity only for injunctive relief, and it is plausible to conclude that defendants Aldi and Santiago in their official capacities as the DOC's SRG Coordinator and Director of Security, respectively, may have authority to grant Martinez injunctive relief from the restrictions to which he is now subject as a result of his SRG designation. *See, e.g.*, *Vaughan v. Aldi*, 2019 WL 1922295, at *2 (D. Conn. 2019); *Scozzari v. Santiago*, 2019 WL 1921858, at *6 (D. Conn. 2019).

It is also plausible that the District Administrator in charge of Corrigan could grant Martinez's requested relief. Defendants Mulligan and Erfe were recently assigned as District Administrators of Districts I and II, respectively. *See Promotions and Reassignments*, CONN. DEP'T OF CORRECTION, https://portal.ct.gov/-/media/DOC/Pdf/Pride/Pride20190418.pdf?la=en (Apr. 18, 2019). Corrigan falls within District II.[1] Accordingly, I will allow Martinez's claim for injunctive relief to proceed against Aldi, Santiago, and Erfe in their official capacities only.

## CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

(1) Martinez's Fourteenth Amendment claim for a violation of procedural due process may proceed against defendants Russell, Payne, and King in their individual capacities; his Fourteenth Amendment claim for deliberate indifference to conditions of confinement may proceed against defendant Russell in his individual capacity; and his claim for injunctive relief may proceed against defendants Aldi, Santiago, and Erfe in their official capacities.

(2) The Court DISMISSES all other claims.

---

[1] There does not appear to be any information published online as to which DOC facilities fall under which district. The Court communicated over telephone with an official in the DOC's Public Information Office, who stated that there are three districts that encompass different facilities and that Corrigan falls within District II.

(3) The Clerk shall verify the current work addresses for defendants Russell, Payne, and King with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to those defendants at the confirmed addresses **within twenty-one (21) days of this Order**, and report to the Court on the status of the waiver requests by not later than the **thirty-fifth (35) day** after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(4) The Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal is directed to effect service of the complaint on defendants Aldi, Santiago, and Erfe at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within twenty-one (21) days from the date of this Order and to file a return of service within thirty (30) days from the date of this Order. It is so ordered.

(5) All defendants shall file their response to the complaint, either an answer or motion to dismiss, **within sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

(6) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(7) The discovery deadline is extended to **six months (180 days) from the date of this Order**. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this order. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over

13

discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

(8) The deadline for summary judgment motions is extended to **seven months (210 days)** from the date of this Order.

(9) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion (*i.e.*, a motion to dismiss or a motion for summary judgment) **within twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

(10) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he must indicate all of the case numbers in the notification of change of address. Plaintiff must also notify defendants or defense counsel of his new address.

(11) Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. As discovery requests are not filed with the Court, the parties must serve discovery requests on each other by regular mail.

It is so ordered.

Dated at New Haven this 4th day of July 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge